(No. 90-CC-2426-

Todd Andrew Schmiedl, Claimant, *v.* The Board of Trustees of the University of Illinois, Respondent.

*Opinion filed June 23, 1994.*

Pelini & Sheffler (Gregory E. Pelini, of counsel), for Claimant.

Thomas, Mamer & Haughery (William Brinkmann, of counsel), for Respondent.

## OPINION

Patchett, J.

As a result of an automobile accident in 1980 in which he sustained serious head and other injuries, the Claimant, Todd Andrew Schmiedl, hereinafter referred to as "Todd," is a quadriplegic. For about a year following the accident, Todd experienced hallucinations which he was advised might be the result of seizure activity. He took seizure medication. Todd cannot walk, has very little use of his hands and arms, and is confined to a wheelchair. He sits in a peculiar manner as a result of the specific nature of his injuries, and his upper body is unstable because of a tendency to sway or lean forward. Quadriplegics continuously shift their weight in order to prevent skin breakdown. The only way Todd can do this is to lean forward. Occasionally he will lean too far and is unstable to right himself. The leaning could cause a muscle spasm to intensify. Patricia Joseph, the attending nurse at the

Beckwith Living Center, hereinafter referred to as "Beckwith," indicated that both she and the aides at Beckwith were aware of Todd's instability. Todd also suffers from chronic spasticity. When Todd suffers muscle spasms, only one part of his body is affected, such as his foot or head, and the spasms do not radiate to other parts of his body. Todd's spasms are fairly regular and mild. Patricia Joseph indicated that when Todd experienced a muscle spasm—which she characterized as a "fine shake, a fine tremor"—it was his habit to shift his weight and lean forward.

In April 1989, Todd was a junior majoring in psychology at the Urbana-Champaign campus of the University of Illinois. He resided at Beckwith, a university-affiliated residence hall. Beckwith houses disabled students and hires live-in, non-skilled aides who attend to the needs of the residents. An in-house nurse is also available. In April 1989, the in-house nurse was Patricia Joseph. The rooms at Beckwith are single occupancy and similar to regular dormitory rooms. The exception is that adjoining rooms share an intervening bathroom. Beckwith provides shower chairs for disabled residents to take showers. A shower chair is similar to a regular wheelchair; however, it is smaller and less bulky. A person has less mobility and stability in a shower chair. Shower chairs are not electrically powered and contain hand rests on the back for manual pushing. While they have foot rests, they do not have straps or restraints. At Beckwith these chairs are left in the hallway for use by anyone. Beckwith did not provide any specific training to aides with regard to the use of shower chairs.

The live-in aides, usually pre-med or medical students, receive free room and board. They assist disabled residents in daily activities, such as dressing, feeding, and

bathing. Weekly schedules assigning aides to residents are prepared by the resident nurse. An aide is assigned to one or two residents for three or four days out of the week.

On April 27, 1989, the aide assigned to Todd was Steve Gordon, hereinafter referred to as "Gordon." The Board of Trustees of the University of Illinois admits that it employed Gordon as an aide at Beckwith. Todd had known Gordon since Gordon came to Beckwith in August 1988. Gordon had previously been assigned to Todd and assisted him with daily activities (dressing, eating, etc.). This included, on several occasions, showering.

Some time between 9:00 p.m. and 9:45 p.m. on April 27, 1989, Gordon approached Todd to determine where Todd was going to take a shower. Because the person who occupied the adjoining room was using the shower, they decided that Todd would take a shower in Gordon's room. Gordon's room was about 50 to 60 feet away. Todd drove down to Gordon's room in his electric wheelchair, and Gordon followed with the shower chair. Once in Gordon's room, Gordon assisted Todd in undressing. He lifted him into the shower chair, and wheeled him into the shower. Nothing was done to fashion a restraint on the shower chair.

When Todd finished showering, he was draped in a towel. Gordon pushed him in the shower chair back to his room. Typically, Todd was transferred directly from the shower chair to bed. Gordon left to retrieve Todd's electric chair. Todd's door was left open, and Todd was about six feet inside the door of his room, facing his window with his back to the door.

In a couple of minutes, Gordon returned with Todd's electric chair. Gordon tried to swerve the electric chair around the right side of the shower chair so that he could

close Todd's door. He stood behind the electric chair and leaned over. He was therefore behind and to the right of Todd. He used the joystick in an attempt to move the electric chair. In attempting to swerve around the shower chair, he accidentally bumped the right rear wheel of the shower chair with the left foot rest of the electric chair, causing the shower chair to lurch forward. Todd felt the shower chair lurch. He had a muscle spasm in his legs. He felt his legs slipping under the shower chair. He tilted forward but was able to right himself. He told Gordon to stop because he was going to fall. Gordon saw Todd tilt forward. He was aware that by continuing to try and swerve the electric chair around the shower chair, the shower chair might be bumped. Nonetheless, he continued in his efforts to swerve around the shower chair, thereby bumping the shower chair five to eight times with the electric chair. Gordon saw the shower chair lurch and Todd tilt forward with each successive bump. Todd heard the click of the electric chair's joystick, and he experienced a series of lurches. He finally fell out of the shower chair.

Todd isn't sure what he hit when he fell. He ended up on his left side, the left side of his head and his left shoulder hit the floor almost simultaneously. He immediately experienced sharp pain in his head, left shoulder, neck, and the side of his leg. He was bleeding from an open gash in his left forehead. His left leg and left arm were bruised, and he felt like he had pulled some muscles.

Gordon called for help. He and Alison Gaughan, Todd's girlfriend, attempted to turn Todd on his back so that he would be more comfortable. After one or two minutes, the attending nurse at Beckwith, Patricia Joseph, hereafter referred to as "Joseph," arrived. The three of them managed to lift Todd onto his bed. Joseph examined

the gash in Todd's head and told him that he needed stitches. Alison Gaughan drove Todd to the emergency room at Mercy Hospital in Urbana. Stitches were inserted to close the gash in his head, and he was given a day's supply of Tylenol 3 for pain and soma compound, a muscle relaxant. Todd incurred medical expenses of $290.49 for this treatment.

The following day, Todd experienced constant pain in his head, neck, shoulder, and all down his left side. In the week following, Todd saw the physical therapist at the Rehabilitation Education Center on three or four occasions and received diathermy treatment. This is the therapeutic use of high-frequency current to generate heat within the body. Laypersons commonly refer to diathermy as heat treatments.

About a week after the fall, the stitches were removed. Todd continued to experience pain, mostly in his neck and shoulder, although the pain had subsided. While some of the pain dissipated after about ten days, Todd's head and left shoulder hurt for a long time. He could not turn his head in a normal manner.

On June 19, 1989, Todd fell at Champion Federal, hereinafter referred to as "Champion." He was going down the ramp at Champion Federal when he became disoriented and lost voluntary control of his body. He fell. Since he was wearing a chest and waist strap, he did not fall out of his electric wheelchair. The wheelchair tipped over. He landed on his left side and hit his head. He also received some scrapes on his back and elbow. That evening his girlfriend, Alison Gaughan, drove him to the emergency room at Mercy Hospital. X-rays were taken, and he was advised that he was okay. He was told to return if he experienced any nausea or vomiting. He was not given any medications or prescriptions. The medical

expenses incurred by Todd with regard to this treatment were $267.84.

Soon after the fall at Champion Federal, Todd again fell while upstairs at Beckwith. He was backing up his electric chair and experienced the same type of disorientation and loss of voluntary control. He lost control of the wheelchair and fell against a wall. He received some scrapes, but he did not desire medical attention. According to Todd, on both occasions he had experienced an uncontrollable twitch in his left hand which radiated up his arm and throughout his body. He also experienced dizziness as if he were falling, loss of voluntary bodily control, and a sense of loss of touch with reality. Todd had never previously experienced these sensations.

Todd suffered more such episodes. In July 1989, soon after his second fall at Beckwith, he was maneuvering his electric chair down the sidewalk when he suddenly experienced a sensation of loss of control. This experience lasted thirty to forty seconds. He lost control of the left side of his arms, and his fingers twisted badly out of control. The following November, he started losing control of his arm while talking with a group of friends in front of Beckwith. The sensation, which lasted a minute to a minute and a half, radiated throughout his body. He asked those present to hold onto him so that he would not fall out of his wheelchair.

In January 1990, Todd's left arm started twitching badly while he was laying down and trying to go to sleep. He asked his girlfriend to hold onto him so that he would not fall out of bed. The sensation lasted about a minute.

After this last episode, Todd went to see Dr. Samuel Young, a neurologist at Christie Clinic in Champaign. Todd related that he had experienced two or three of the

episodes. He told the doctor that the jerking began in his left hand before radiating to his left arm and leg. He also informed Dr. Young that at some prior time, he had taken seizure medication. Dr. Young, however, saw no evidence that Todd had experienced any seizures since his accident in 1980.

Dr. Young was of the opinion that Todd was experiencing focal motor or Jacksonian seizures. He felt that they were probably due to some irritation of the right side of his brain. According to Dr. Young, focal motor seizures can be of varying duration and intensity. They can progress from one part of the body to another. They can, however, remain focal or localized, involving only one side of the body, as opposed to progressing into a grand mal seizure. Dr. Young recommended that Todd begin taking daily doses of Tegretol, an anti-convulsant. Dr. Young was of the opinion that Todd should remain on anti-convulsant medication, although it is his practice to taper a patient suffering idiopathic seizures off anti-convulsants if the patient is seizure free for two years. Idiopathic seizures are seizures of unknown etiology or cause. Dr. Young admitted, however, that tapering off anti-convulsant medication, or eliminating it altogether, entails a risk. Consequently, he restricts the activities of patients in such circumstances, and he cautions them to be very careful because of increased risk. In addition, he indicated that the probability of a complete cessation of medication is not better than fifty-fifty.

Todd also saw Dr. Kenneth S. Aronson, a neurologist at Carle Clinic in Urbana, Illinois. Dr. Aronson was also of the opinion that Todd had suffered focal motor seizures. He believed that Todd was predisposed toward seizure disorder as a result of the head injuries he had suffered in a car accident. He believed, however, that the

actual seizure activity commencing in June 1989 was triggered by Todd's fall and injuries in April 1989 after the shower. He explained that some people who are predisposed to seizure disorder, such as those who have preexisting brain injuries, may experience head injuries without any adverse effect. In others, such injuries may activate actual seizure activities. The type or severity of head trauma necessary to trigger such activity will vary depending on the person's stability and predisposition. In someone who is very unstable, a very minor head injury not involving loss of consciousness, may spark seizure activity. Dr. Aronson was of the opinion that since Todd was experiencing seizures, he would require anti-convulsant medication indefinitely.

Alan E. Dillingham, a Professor of Economics at Illinois State University in Normal, indicated that the present value of Todd's anti-convulsant medication expenses over the course of his anticipated lifetime is between $4,821 and $7,707. Both medical doctors agreed that the use of anti-convulsant medication would not guarantee that Todd would not suffer further seizures.

Up until the time of the hearing, the anti-convulsant medication had succeeded in stopping the twitching and sensation of loss of control. If Todd fails to take the medication, he experiences muscle twitching, becomes dizzy, and feels like he is flying. Todd has continuously been prescribed and taken such medication since seeing Dr. Young in January 1990.

Todd still suffers episodes of being disoriented, although not as bad as before. Because of the episodes in which he experienced loss of voluntary control and seizures, Todd has altered his lifestyle. He does not go out as much as before, and he restricts his activities for fear that he will have a seizure in public. He also takes

pains to insure that he is accompanied by someone who is aware of his condition and knows what to do in the event he suffers a seizure.

Todd has exhausted all applicable administrative remedies and sources of recovery on this claim. No payment or other action to compensate Todd has been taken on this claim by the Board of Trustees of the University of Illinois.

This court has exclusive jurisdiction to hear all claims sounding in tort against the Board of Trustees and the University of Illinois. The Claimant, Todd Andrew Schmiedl, complied with all applicable notice and statute of limitation requirements.

Steve Gordon was an employee of the Board of Trustees for the purposes of this claim. As such, Gordon was under duty to exercise ordinary due care for the safety of Todd.

Gordon failed to exercise ordinary care and breached his duty by causing Todd to fall out of the shower chair. As a result and proximate result of that negligence, Todd was seriously injured. Those injuries are severe and appear to be permanent. Todd has suffered pain and suffering, medical and medication expenses, and will have future medication expenses. In addition, the degree of his disability has been increased significantly as a result of this accident.

For that reason, we find liability to exist and set damages at the sum of fifty thousand dollars ($50,000).